JOURNAL ENTRY AND OPINION
{¶ 1} Annette L. Morad appeals from the judgment of the common pleas court affirming the decision of the Ohio Unemployment Compensation Review Commission (the "Commission") to deny her unemployment benefits. This case came to the common pleas court as an administrative appeal from the Commission pursuant to R.C. 4141.282.[1] For the reasons set forth below, we reverse the judgment of the lower court.
 {¶ 2} In August 2001, claimant was hired as a full-time bookkeeper/leasing agent by West Terrace Management, Inc. ("West Terrace"). West Terrace is a property management company that manages several apartment complexes in the Cleveland, Ohio area. Peter Parras, one of the owners of the company, hired claimant.
 {¶ 3} When hired, claimant was put on probationary status for ninety days. During that period, she received $9.00 per hour. Once the probationary period expired, claimant expected to receive $500 per week in wages and a health benefit package.
 {¶ 4} Claimant was trained to complete tenant eviction notices. In September and October, claimant was told to backdate the notices. Claimant believed the practice of backdating was wrong, if not illegal.
 {¶ 5} Once her probationary period ended, claimant confronted Parras about backdating the eviction notices. Parras became angry and told claimant to leave the premises. Claimant left, believing she had been fired. That evening, claimant received a telephone call from her supervisor, Jim Gruzosky, who asked claimant whether she would return to work or not. Before responding, Claimant asked whether she would still be required to backdate the eviction notices, to which Gruzosky replied that she would do as told or quit. Claimant quit.
 {¶ 6} Claimant applied for and was denied unemployment benefits by the Ohio Department of Jobs and Family Services ("Department"). The Department determined that claimant voluntarily quit her employment at West Terrace without just cause. Claimant's appeal of the Department's decision was eventually brought to the Commission for a hearing.
 {¶ 7} The Commission affirmed the Department's decision, whereupon claimant sought but was denied review of that decision. Claimant then appealed to the Cuyahoga Court of Common Pleas, which affirmed the Commission's decision that she quit without just cause and thus was not eligible for unemployment benefits. Claimant now appeals and presents two assignments of error:
I. THE COURT OF COMMON PLEAS ERRED IN AFFIRMING THE BOARD OF REVIEW'S DETERMINATION THAT MS. MORAD QUIT HER JOB WITHOUT JUST CAUSE WHEN THAT DETERMINATION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS UNREASONABLE.
 {¶ 8} Claimant argues that when she left her employment at West Terrace she had just cause to do so and is, therefore, entitled to unemployment benefits. She argues that the manifest weight of the evidence presented during the hearing before the Commission supports her entitlement to those benefits. We agree.
 {¶ 9} On appeal, this court "may reverse the board's determination only if it is unlawful, unreasonable, or against the manifest weight of the evidence." Tzangas, Plakas Mannosv. Administrator, Ohio Bureau of Employment Servs.,73 Ohio St.3d 694, 697, 1995-Ohio-206, 653 N.E.2d 1207.
In making this determination, we must give deference to the Commission in its role as finder of fact. Irvine v. UnemploymentComp. Bd. of Rev. (1985), 19 Ohio St.3d 15, 18, 19 Ohio B. 12,482 N.E.2d 587. We may not reverse the Commission's decision simply because "reasonable minds might reach different conclusions." Id. On close questions, where the board might reasonably decide either way, we have no authority to upset the agency's decision. Id. Instead, our review is limited to determining whether the Commission's decision is unlawful, unreasonable, or totally lacking in competent, credible evidence to support it. Id. A judgment supported by some competent, credible evidence going to all the essential elements of the controversy will not be reversed by a reviewing court as being against the weight of the evidence. C.E. Morris Co. v. FoleyConstruction Co. (1978), 54 Ohio St.2d 279, 376 N.E.2d 578.
Fisher v. Bill Lake Buick, Cuyahoga App. No. 86338,2006-Ohio-457, ¶ 24.
 {¶ 10} In Ohio, to be eligible for unemployment compensation benefits, claimants must satisfy the criteria established pursuant to R.C. 4141.29(D)(2)(a), which provides in part as follows:
 (D) * * * [No] individual may * * * be paid benefits * * *: * * *
(2) For the duration of his unemployment if the administrator finds that:
(a) He quit his work without just cause or has been discharged for just cause in connection with his work * * *.
Pursuant to R.C. 4141.29(D)(2)(a), a claimant is ineligible for unemployment benefits if she quits a job without "just cause."
 {¶ 11} The phrase "just cause" is not defined in the statute; therefore, whether an employee had just cause to leave employment is a factual question determined on a case-by-case basis.Tzangas, supra, citing Irvine v. Unemp. Comp. Bd. of Review
(1985), 19 Ohio St.3d 15, 17, 482 N.E.2d 587. The Ohio Supreme Court has, however, provided some limited guidance by defining "just cause" as "that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act." Id., at 697, citing Irvine.
 {¶ 12} In the case at bar, the Commission's Hearing Officer conducted a hearing at which only claimant and Parras appeared and gave evidence. At the end of that hearing, in a written opinion, the Hearing Officer concluded that claimant quit without just cause. We disagree.
 {¶ 13} During the hearing, claimant testified that in August, during her probationary period, she was shown how to complete the company's tenant eviction notices. In September, claimant was told to complete several notices on her own. As instructed during her training, claimant put the current date on the notices and then gave them to Parras.
 {¶ 14} Returning the notices to claimant, Parras stated that she had put the wrong date on them and instructed her to backdate the notices to an earlier date. He told her to start over and shred the notices she had already completed. She complied, but at the hearing she testified that because she had previously been a tenant, she "knew it was an incorrect procedure." She was not sure, however, whether it was illegal or not. Hearing Tr. at 12.
 {¶ 15} In mid-October, when claimant was told to complete a second set of notices on her own, she questioned Gruzosky about the practice of backdating them. Gruzosky told her to do as she was told. She did not mention the subject again until approximately two weeks later when she had her probationary review.
 {¶ 16} The review was conducted by Parras. He told claimant that her job performance was satisfactory and that she would receive an hourly raise of $.50. When asked whether she had any comments, claimant expressed her concern about backdating eviction notices. She told him that backdating the notices was improper. She also told him that she did not think $.50 per hour was what they had agreed on and that it was not a substantial raise at all. Claimant described the rest of the review:
He asked me if I had any problems on the job, I said, yes, I did. We discussed the three day notices and the problem I felt we were having with it. He told me that that was none of my business. That he makes the decisions around here. And he dismissed that.
And he started to tell me that he had some other work and he handed me some more work and told me to go do it. By this time it was ten to 5:00. I worked until 5:30. And he left the office at 5:00 o'clock. And Linda and I both stayed and worked until 5:30. And I finished the work he assigned me as I was leaving the office and I left. I was really upset. He had spoken to me terribly during that meeting. He told me what did I need to be paid that kind of money for and we were discussing it.
This was the first time he had ever discussed on that level with me, what did I need to be paid like that for. He told me, what's the matter with you, how come you don't have a husband or boyfriend who can take care of you, why do you need that big house anyway, you don't need that house. I've been in my house for three years, sir, I don't need an employer to tell me what I need. He went on to attack me in several more personal ways. I was upset by the way he was talking to me. I was upset by the fact that he did not pay me as we pre-agreed when I began. We had several meetings before I was hired, two meetings personally, one on the phone, all of which pay was discussed by me. He said, what do you expect, I told him what I expected. He never said —
Q: What did you tell her . . . What did you tell him you were expecting?
A: I told him for the job that he wanted, I thought that $500 a week would be fair. He told me that you don't get two weeks vacation. I said, well, $500 a week I thought was fair for the job he was asking me to do. It was a very detailed and a very large task.
Q: And so he settled on what per week?
A: He told me that for the first 90 days, I was to be paid $9 an hour.
Q: And what does that work out to, do you know?
A: It's not even 18 . . . a little over 18 thousand a year which is 2,000 plus less than I was receiving at my last job. I agreed to that because the potential was there for a good job. He told me that at the end of the 90 days if everything checked out, if my work was up to par, if I dressed like he told me to dress, if everything was okay, you know, my work performance, he would give me a raise and benefits, he would take care of me. He never in any way told me that what I was saying to him about pay and benefits was not in line with what he wanted to pay me. And never in any way until that 90 day notice did he say to me that what I had been saying to him from the first phone conversation to the interview to hire, that was the first time at 90 days he was saying that that was not what he planned to do with me.
Tr. 18-20.
 {¶ 17} At the end of the review, Parras told claimant that if she did not like the proposed compensation, she could obtain employment elsewhere. Claimant returned to her desk and finished working for the day. The next two days, Wednesday and Thursday, were claimant's scheduled days off.
 {¶ 18} When she returned to work on Friday, claimant discussed what occurred on Tuesday with her supervisor, Jim Guzovsky. She also handed him a letter she had written during her two days off. The letter detailed the terms of employment she would accept. Parras came into the room and claimant read the letter out loud. As she read it, Parras became incensed and ordered claimant to leave the premises. At this point, claimant believed that she had been fired.
 {¶ 19} Later that evening, however, claimant received a telephone call at home from Guzovsky asking her whether she had quit or was she going to return to work? Claimant's response was as follows:
I said, well, I . . . I'll come back to work as long as Idon't have to illegally fill out paperwork and as long as you guys make good on the pay that you told me. I will not . . .It's non-negotiable about incorrectly filling out paperwork.
And, I'm upset that I've been mislead [sic] for 90 days. He said, listen, you either come in, take what we give you, do what we say or you quit. I go, you know what Jim, in that case I guess I quit. I'm not being ordered about illegally by someone. My name,my reputation and my sleeping at night is more important than youevicting someone illegally. (Emphasis added.)
Tr. 26-27.
 {¶ 20} On rebuttal, Parras essentially denied everything claimant described. Parras denied that he ever told claimant to backdate eviction notices and he denied that he ever promised her a "substantial" raise, let alone a salary between $400 to $500 per week.
 {¶ 21} In his written decision, the Hearing Officer drew several conclusions from the evidence. Initially, the Hearing Officer observed that Parras could have rebutted claimant's charge of backdating notices by "presenting all notices prepared in September and October. The employer having failed to do so, the Hearing Officer finds claimant's testimony to be more credible." Hearing Officer's Decision, at 2. Despite his determination that claimant was telling the truth about being told to backdate the notices, the Hearing Officer made the following findings:
* * * the Hearing Officer takes note of claimant's written demands given to her employer on November 2, a copy of which is in the record. Claimant offers her employer three options. First, that she continue to work without being asked to do anything "improper, illegal, or immoral." The second option is that the employer pay her eight weeks of severance and "write up my exit so I am allowed my unemployment benefits" thereby avoiding "costly or embarrassing problems for either party." The third option was that she would file for unemployment stating she quit for failure to pay the agreed wage and being required to violate"accepted moral and legal standards."
If backdating three day notices was a substantial factor in claimant's decision to quit, she would have done so immediately. Those who take the high moral ground do not wait to see what their next raise is going to be. And they do not suggest writing up their exit in order to be eligible for unemployment compensation.
As for the issue of wages, without an agreement between the parties as to the meaning of "substantial", [sic] the fifty cent or 5.5 percent raise offered by the employer cannot be said to be a violation of the hiring agreement. Having accepted a job without nailing down the wage scale, claimant's decision to quit over the issue of pay was not for just cause. (Emphasis added.)
Commission Hearing Officer Decision, at 3-4. From this determination, it is clear that the Commission assigned fault to claimant.
 {¶ 22} Claimant argues that not only are the Hearing Officer's findings not supported by the record, there is also legal precedent demonstrating that his findings are contrary to law.
 {¶ 23} In Carter v. Board of Review and Administrator, OhioBureau of Employment Services (Mar. 16, 1984), Lucas App. No. L-83-392, 1984 Ohio App. Lexis 9285, claimant appealed the Board of Review's determination that he quit his employment without just cause. On appeal, the court discussed the following undisputed facts.
 {¶ 24} Claimant's employer made him perform his work with equipment that did not work properly. As a result, claimant's job was made dangerous. Claimant complained to his employer not only about the equipment but also because he believed the company's customers were being intentionally cheated. The court determined that there was uncontroverted evidence suggesting; that the equipment employed by DeWitt was frequently broken or inadequate for the job. Further, the record indicates that DeWitt required appellant to perform work which, at least in appellant's mind, was unfair to the customers and, arguably, illegal. The employer did not contradict said evidence, although it clearly had notice of the hearing and an opportunity to present evidence * * *.
Id., at *4-*5. The court concluded that, because claimant's employer "persistently employed faulty or broken equipment, coupled with the appellant's belief that customers were being cheated," claimant had just cause to quit his employment. Id., at *7.
 {¶ 25} In Whipkey v. Ohio Bureau of Employment Services
(C.P. Washington Cty. 1994), 63 Ohio Misc.2d 517, 635 N.E.2d 88, the court also reversed a denial of unemployment benefits to an employee, who the court determined had just cause to quit her employment because her employer required her to lie about patients' medical charts.
 {¶ 26} The court concluded that "an individual who quits work because of a belief that continuance in the employment would violate some principle of good moral conduct may be considered to have quit with just cause. A violation of the claimant's morals includes being required to do anything which is immoral, dishonest, illegal, or unethical." Id., 522-523.
 {¶ 27} In the case at bar, the Hearing Officer determined that claimant was more credible than Parras. He must, therefore, have also decided that West Terrace required claimant to backdate eviction notices. Throughout the proceedings, claimant was unequivocal that the practice of backdating is repugnant to her because she knows it is wrong. West Terrace's practice of backdating is equivalent to the lying required of the employee inWhipkey.
 {¶ 28} In the case at bar, requiring claimant to backdate the notices not only offended her personal moral code, but is arguably illegal. Although the Hearing Officer found claimant more credible on whether Parras had ordered her to backdate, the Hearing Officer stopped short of acknowledging the illegality of backdating. See, R.C. 1923.04(A);[2] Godbelt v. McClain
(Nov. 20, 1995), Licking App. No. 94-CA-0066, 1995 Ohio App. LEXIS 5953, at *2-*3, (Pursuant to R.C. 1923.04, "[p]roper service of the three-day notice is a condition precedent to the court taking jurisdiction over an eviction proceeding"). Instead, the Hearing Officer decided that he did not find that requiring her to backdate notices was a "substantial factor" for her quitting. According to him, if claimant truly objected to backdating the notices, she would not have waited "to see what [her] next raise [was] going to be." Hearing Officer Determination, at 3. Further, if claimant were sincere in her objection to backdating the notices, the Hearing Officer concluded, she would not have written the letter as a means of qualifying for unemployment compensation.[3]
 {¶ 29} Claimant clearly explained the dual nature of her problems with the employer: the backdating order and the pay dispute. Apparently accepting her claim that the illegal order was a reason for quitting, the Hearing Officer concluded that the backdating order was not a "substantial factor" in the claimant's decision. The statute, however, does not require that a claimant's reason for leaving be a "substantial factor" in her decision in order for that reason to qualify as a just cause.[4]
 {¶ 30} Claimants can have more than one reason for terminating their employment. And none of their reasons must be more substantial or compelling than their other reasons. See,Voss v. Bailey's Tree Landscape Serv. (Oct. 31, 1997), Sandusky App. No. S-97-020.
 {¶ 31} As explained by the Ohio Supreme Court in Irvine,
supra, the correct standard of review has to do with determining whether an employee had just cause to leave employment. As explained by the Ohio Supreme Court:
"Traditionally, just cause, in the statutory sense, is that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act." Peyton v. SunT.V. (1975), 44 Ohio App.2d 10, 12 [73 O.O.2d 8].
 {¶ 32} In Ohio, an at-will employee is justified in leaving employment when the employer requests the employee to perform an illegal act. See, Painter v. Graley (1994), 70 Ohio St.3d 377,639 N.E.2d 51.[5] Requesting an employee to commit an unlawful act is against public policy and it constitutes just cause to leave employment. Id. When there is an indication (even if not "a substantial factor") that claimant quit because of an illegal order, the Commission should not condone such a request by prohibiting benefits.
 {¶ 33} In the case at bar, not only did the Hearing Officer apply the wrong standard of review, his conclusions are unsupported by the evidence. Claimant never indicated her quitting was based solely on the pay issue. Claimant never stated that if the employer paid her more she would ignore the backdating issue. On the contrary, she expressly made a legal resolution of this issue a necessary condition of her return.
 {¶ 34} What triggered claimant being ordered off the premises was her questioning the legality of her employer's policy. When she was ordered off the premises, claimant believed she had been fired. The only immediate reason for this order was her questioning her employer's policy. Thus she properly attributed her questioning that policy as the basis of her being fired. When the employer called, claimant again asked whether she would have to comply with the order to backdate notices. At the hearing she specifically stated that she explained she would not return to work because of that order. The employer never denied that claimant expressly specified this necessary condition to her returning. Thus the employer never provided any conflicting testimony regarding claimant's priorities.
 {¶ 35} The Hearing Officer, however, did not find claimant credible on her reason for quitting. He determined that being asked to illegally backdate notices was not a substantial factor in her decision to quit, because he she did not "immediately" quit. He does not explain precisely when "immediately" should have occurred.
 {¶ 36} The Hearing Officer cites only to her waiting until her raise was rejected. That date, however, was the same date she again questioned the policy and was ordered off the premises. She did not quit immediately after she was notified of her raise. Rather, she left believing she had been fired because of her questioning the policy. Her employer, moreover, does not deny that she stated her refusal to return immediately after the employer called her and she questioned the policy again. The Hearing Officer also totally ignores the clear explanation the claimant offered as to why she did not "immediately" quit: she was not certain as to the illegality of what she had been ordered to do.
 {¶ 37} Claimant did not leave her employer because of the pay issue. Claimant never stated that if the employer paid her more she would ignore the backdating issue.
 {¶ 38} From the record before this court, we conclude that the evidence supports the determination that a reasonable person would have justifiably quit her job under the same conditions. Accordingly, the Commission's conclusion that claimant quit her employment without just cause is unlawful, unreasonable, and against the manifest weight of the evidence. Claimant's first assignment of error is sustained. Since claimant's first assignment of error is dispositive of this appeal, claimant's second assignment of error is now moot.[6]
Judgment accordingly.
This cause is reversed and remanded.
It is, therefore, ordered that appellant recover of appellees her costs herein taxed.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Celebrezze, Jr., P.J., and McMonagle, J., concur.
[1] R.C. 4141.282, provides, in part, as follows:
(A) THIRTY-DAY DEADLINE FOR APPEAL
Any interested party, within thirty days after written notice of the final decision of the unemployment compensation review commission was sent to all interested parties, may appeal the decision of the commission to the court of common pleas.
[2] R.C. 1923.04(A), provides as follows:
"(A) Except as provided in division (B) of this section, a party desiring to commence an action under this chapter shall notify the adverse party to leave the premises, for the possession of which the action is about to be brought, three or more days before beginning the action, by certified mail, return receipt requested, or by handing a written copy of the notice to the defendant in person, or by leaving it at his usual place of abode or at the premises from which the defendant is sought to be evicted."
[3] The Hearing Officer also ignored claimant's testimony about the manner in which Parras spoke to her when she disputed the $.50 cents per hour raise. Claimant testified that Parras demeaned her by asking why she needed her house and why she did not have a man to take care of her. Parras never denied claimant's specific recollection of what he said to her. Quite the opposite; Parras merely recharacterized it as "friendly advice." Tr. 36. The Hearing Officer did not address Parras' gender-based reasons for denying claimant a pay increase.
[4] Henize v. Giles (1990), 69 Ohio App. 3d 104, 111,590 N.E.2d 66, initially added language to the "just cause" definition given in Irvine v. Unemp. Comp. Bd. of Review
(1985), 19 Ohio St.3d 15, 482 N.E.2d 587. Henize adds the phrase "in a substantial way." Henize defines "just cause" as that which, to an ordinarily intelligent person, is a justifiable reason for quitting, where that cause is related in a substantialway with the person's ability to perform in his employment capacity, is essentially "involuntarily" unemployed. (Emphasis added.)
Only Summit County seems to follow the standard set forth inHenize. The 4th, 6th, 7th, 10th, and 12th
appellate districts, however, follow the less restrictive standard set forth in Irvine, supra. See, Hurd v. Ohio Dep'tof Job Family Servs., Mahoning App. No. 01 CA 180, 2002-Ohio-5874; Morris v. Ohio Dep't of Job Family Servs.,
Columbiana App. No. 2001 CO 55, 2002-Ohio-5250; Voss v. Bailey'sTree Landscape Serv. (Oct. 31, 1997), Sandusky App. No. S-97-020; Hammond v. Somers Agency (July 3, 1996), Lorain App. Nos. 95CA006273, 95CA006293; Shrout v. Administrator, OhioBureau of Employment Servs. (July 11, 1994), Warren App. No. CA94-02-021; and Herrold v. Administrator, Ohio Bureau ofEmployment Servs. (July 30, 1993), Vinton App. No. 92CA486.
[5] As the Supreme Court stated in Painter,
To state a claim of wrongful discharge in violation of public policy, a plaintiff must allege facts demonstrating that the employer's act of discharging him contravened a "clear public policy" (Greeley v. Miami Valley Maintenance Contractors, Inc.
[1990], 49 Ohio St.3d 228, 551 N.E.2d 981, affirmed and followed.)
* * *
"Clear public policy" sufficient to justify an exception to the employment-at-will doctrine is not limited to public policy expressed by the General Assembly in the form of statutory enactments, but may also be discerned as a matter of law based on other sources, such as the Constitutions of Ohio and the United States, administrative rules and regulations, and the common law. (Tulloh v. Goodyear Atomic Corp. [1992], 62 Ohio St.3d 541,584 N.E.2d 729, overruled.)
Id., at syllabus.
[6] "II. THE COURT OF COMMON PLEAS ERRED IN AFFIRMING THE BOARD OF REVIEW'S DETERMINATION THAT MS. MORAD QUIT HER JOB WITHOUT JUST CAUSE DESPITE THE BOARD OF REVIEW'S FINDING THAT HER TESTIMONY WAS CREDIBLE REGARDING THE FACT THAT SHE WAS ASKED TO PERFORM ILLEGAL TASKS BY HER EMPLOYER."