[Cite as *Barno v. Dir., Dept. of Job & Family Servs.*, 2018-Ohio-2133.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 105933

---

**PATRICK BARNO**

PLAINTIFF-APPELLANT

vs.

**DIRECTOR, ODJFS, ET AL.**

DEFENDANTS-APPELLEES

---

**JUDGMENT:**
REVERSED AND REMANDED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-15-844729

**BEFORE:** Blackmon, J., Boyle, P.J., and Keough, J.

**RELEASED AND JOURNALIZED:** May 31, 2018

[Cite as *Barno v. Dir., Dept. of Job & Family Servs.*, 2018-Ohio-2133.]

-i-

## ATTORNEYS FOR APPELLANT

Kenneth J. Kowalski
Cleveland Marshall Civil Litigation Clinic
1801 Euclid Avenue, LB 138
Cleveland, Ohio 44115

Doron M. Kalir
Cleveland Marshall Civil Litigation Clinic
Cleveland Marshall College of Law
2121 Euclid Avenue, LB 138
Cleveland, Ohio 44115

## ATTORNEYS FOR APPELLEES

Mike DeWine
Ohio Attorney General

Laurence R. Snyder
Assistant Attorney General
615 West Superior Avenue, 11th Floor
Cleveland, Ohio 44113

## For Great Lakes Water Treatment, Inc.

Great Lakes Water Treatment, Inc.
4949 Galaxy Parkway, Suite G
Warrensville Heights, Ohio 44128

ON RECONSIDERATION[1]

PATRICIA ANN BLACKMON, J.:

{¶1}  Upon review, this court grants appellee's application for reconsideration pursuant to App.R. 26(A)(1).  The application did not call to the attention of this court an obvious error in our opinion; however, the manifest weight of the evidence standard of review to be applied to civil cases merits further consideration. This court's decision to reverse the denial of unemployment benefits remains unchanged.

{¶2} Patrick Barno ("Barno") appeals from the trial court's affirming the denial of his application for unemployment benefits in this administrative appeal and assigns the following errors for our review:

> I.  The Review Commission Hearing Officer's Decision is unlawful because it either ignored or misstated the law of Ohio on a number of important issues.
>
> II.   The Decision of the Review Commission is erroneous in that it is unreasonable and against the manifest weight of the evidence.

{¶3}  Having reviewed the record and pertinent law, we reverse the decision and remand to the trial court.   The apposite facts follow.

{¶4}  On February 17, 2014, Barno began working for Great Lakes Water Treatment ("GLWT") as an "in-store lead generator."  Barno was stationed at a Home Depot, where he signed up customers for an in-home demonstration of GLWT's water purification system.

---

[1]The original decision in this appeal, *Barno v. Dir., ODJFS,* 8th Dist. Cuyahoga No. 105933, 2018-Ohio-1196, released March 29, 2018, is hereby vacated.   This opinion, issued upon reconsideration, is the court's journalized decision in this appeal.  *See* App.R. 22 (C); *see also* S.Ct.Prac.R. 7.01.

GLWT instructed Barno to tell customers that, as an incentive, they would receive a $20 Home Depot gift card upon completion of the demonstration.

**{¶5}** According to Barno, when he was hired, GLWT explained the weekly marketing bonus he would receive, starting at $2 for each lead that resulted in a demonstration and $25 for each lead that resulted in a sale. Barno's understanding was that the marketing bonus increased based on the number of demonstrations and sales generated on a weekly basis. Although GLWT did not give Barno any written documentation of the company's commission structure at the time Barno was hired, or at any other time during Barno's employment, Barno took notes during his interview, which reflect the following:

> $2.00 for first 2 leads – confirmed
> $3.00 for each after that
> $25.00 per system sale for first sold
> $50.00 per system sale for second sold
> $100.00 per system sale 3rd sale
> $150.00 up from there
> paid weekly

**{¶6}** On April 22, 2014, Barno notified his manager, Brian Hlavac ("Hlavac"), of two issues he was having regarding "shortages" in his paychecks. First, Barno complained that he was not paid for four hours that he worked. On April 28, 2014, Barno followed up with a letter to Hlavac requesting that this issue be corrected. Hlavac determined that the hours Barno worked were miscalculated and corrected the issue.

**{¶7}** Second, Barno complained to Hlavac that his paychecks were "short on commissions." Barno first became aware that one of his leads turned into a sale when the customer came back into Home Depot to complain about his new water system. According to Barno, he was never paid his marketing bonus for this sale. Barno also identified one other sale

for which he was allegedly never paid. According to Barno, GLWT had no record-keeping system to inform its employees of the disposition of their leads. When Barno notified Hlavac about the missing bonuses, Hlavac said they "would show up on the check."

{¶8} Barno experienced "issues weekly" regarding unpaid or underpaid bonuses, and "[n]early every Tuesday he complained to Mr. Hlavac that his check did not appear to include bonuses for sales of the water purification systems." Hlavac typically responded that he was "going to look into it." Ultimately, however, GLWT did nothing in response.

{¶9} Additionally, Barno began to question the ethical practices of GLWT. For example, a customer who purchased GLWT's water purification system returned to Home Depot "livid" and asked to cancel his contract. Barno called Hlavac, who instructed Barno to tell the customer to continue calling GLWT's office. According to Barno, "GLWT would screen incoming calls with Google Voice and likely not answer." Furthermore, other customers returned to Home Depot to complain about the high-pressure sales pitch and that they never received their promised $20 Home Depot gift cards. According to Barno, Hlavac said in response, "yes I know they call and call," and GLWT's position was to "just continue to re-pitch them and resell them and sooner or later they would get tired and stop calling."

{¶10} Barno identified other GLWT practices that he felt were unethical. For example, at the end of March or early April, Hlavac instructed Barno not to write up leads for "elderly people * * *, Russians, Orientals, anybody in zip code 441-anything, and by the way, Indians." Barno was uncomfortable with these tactics and thought them to be unethical.

{¶11} On August 26, 2014, Barno told Hlavac that he was concerned about training new people to engage in these practices. Hlavac stated that Barno "had to do it, he had no one else."

Barno also told Hlavac he could no longer wait to be paid correctly. Hlavac told Barno he was being paid correctly and, according to Barno, for the first time Hlavac stated that "it depends on what pay program you're in." Barno told Hlavac, "there's only one pay program that I know of." Hlavac "had nothing else to say" in response. That same day, Barno quit his job, claiming that GLWT failed to honor the bonus structure they had promised him and engaged in unethical treatment of its customers.

{¶12} On August 27, 2014, Barno applied for unemployment compensation benefits. On September 26, 2014, the Ohio Department of Job and Family Services Office of Unemployment Compensation ("ODJFS") issued a determination disallowing Barno's application for unemployment compensation benefits, finding that Barno

> did not establish that he/she was compelled to quit for ethical reasons. Ohio's legal standard that determines if a quit is without just cause is whether the claimant acted as an ordinary person would have under similar circumstances. After a review of the facts, this agency finds that the claimant quit without just cause under Section 4141.29(D)(2)(a), Ohio Revised Code.

Barno appealed this determination.

{¶13} On November 7, 2014, the agency issued a redetermination affirming the initial decision disallowing Barno's unemployment benefits. The agency's findings were identical to the findings it made in its initial September 26, 2014 decision. Barno appealed this redetermination.

{¶14} On December 12, 2014, January 5, 2015, and January 27, 2015, the Unemployment Compensation Review Commission ("UCRC") held telephone hearings regarding Barno's appeal.

{¶15} On February 10, 2015, the UCRC found that Barno quit his employment without just cause and upheld the denial of his unemployment benefits. On March 25, 2015, the UCRC denied Barno's request for review. Barno appealed to the Cuyahoga County Court of Common Pleas. On May 24, 2017, the court affirmed the UCRC decision, finding that it "is not unconstitutional, illegal, arbitrary, capricious, unreasonable, nor unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record." It is from this order that Barno appeals.

## Standard of Review

{¶16} Pursuant to R.C. 4141.29(D)(2)(a), and as pertinent to the facts of this case, an employee may receive unemployment compensation if the employee quit work with just cause. "Traditionally, just cause, in the statutory sense, is that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act." *Peyton v. Sun T.V. & Appliances*, 44 Ohio App.2d 10, 12, 3354 N.E.2d 751 (10th Dist.1975). *See also Tzangas, Plakas & Mannos v. Admr., Ohio Bur. of Emp. Servs.*, 73 Ohio St.3d 694, 653 N.E.2d 1207 (1995). "Whether just cause exists is unique to the facts of each case." *Sinclair v. Ohio Dept. of Job & Family Servs.*, 8th Dist. Cuyahoga No. 101747, 2015-Ohio-1645, ¶ 4.

{¶17} Applications for unemployment benefits begin with ODJFS, which issues an initial determination allowing or disallowing the claim. These determinations may be appealed, by either the employee or the employer, to the UCRC, which acts as the trier of fact and issues a decision regarding ODJFS's determination. This decision may be appealed to the court of common pleas. Pursuant to R.C. 4141.282(H)

> [t]he court shall hear the appeal on the certified record provided by the commission. If the court finds that the decision of the commission was unlawful,

unreasonable, or against the manifest weight of the evidence, it shall reverse, vacate, or modify the decision, or remand the matter to the commission. Otherwise, the court shall affirm the decision of the commission.

{¶18} "At the outset, there should be no question that a court of appeals has the authority to reverse a judgment as being against the manifest weight of the evidence." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 7. "In civil cases, the concepts of sufficiency of the evidence and weight of the evidence continue to be sources of confusion, particularly as to what standard of review should apply when a verdict is challenged as being against the weight of the evidence." *Id*. at ¶ 9.

{¶19} In *Eastley*, the Ohio Supreme Court held that "the *Thompkins* standard of review for manifest weight of the evidence applies in civil cases." *Id*. at ¶ 16.

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*

(Emphasis sic.) *Eastley* at ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). *See also State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, (a manifest weight of the evidence argument concerns the quality, rather than the quantity, of evidence and "addresses the evidence's effect of inducing belief. In other words, a

reviewing court asks whose evidence is more persuasive — the state's[/plaintiff's] or the defendant's?").

{¶20} The *Eastley* court noted that "neither the constitution nor statutes nor rules of procedure treat civil cases differently from criminal cases with regard to appellate review on the issues of sufficiency and manifest weight." *Id.* at ¶ 17. The court further explained as follows:

> because "manifest weight of the evidence" refers to a greater amount of credible evidence and relates to persuasion, it does not matter that the burden of proof differs in criminal and civil cases. In a civil case, in which the burden of persuasion is only by a preponderance of the evidence, rather than beyond a reasonable doubt, evidence must still exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight).
>
> * * *
>
> In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact.
>
> "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *
>
> "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."
>
> *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978).

*Eastley* at ¶ 19-21. *Compare Portage Cty. Bd. Of Dev. Disabilities v. Portage Cty. Educators' Assn. for Dev. Disabilities*, Slip Opinion No. 2018-Ohio-1590, ¶ 2 ("When reviewing a trial court's decision to confirm, modify, vacate, or correct an arbitration award, an appellate court should accept findings of fact that are not clearly erroneous but should review questions of law de novo").

**{¶21}** "There is no distinction between the scope of review of common pleas and appellate courts regarding just cause determinations under the unemployment compensation law. * * * Accordingly, [an appellate court] is bound by the same limited scope of review as the common pleas court." *Sinclair* at ¶ 6.

### UCRC Hearing Testimony

**{¶22}** Barno testified that he noticed commission shortages on his paychecks dated February 25, 2014, and March 4, 2014. According to Barno, he knew there was a problem with his paychecks, but he "didn't know how to track it. * * * Not having any disposition regularly, I never know what's been * * * purchased and what's to be paid, but I was aware * * * that there was a sale and knew it was to be paid and hadn't been." According to Barno, he was the only in-store marketer for GLWT in that particular Home Depot, and all sales were necessarily generated through him. However, on cross-examination, Barno testified that it was possible for someone to get a new GLWT water system from the Home Depot at which he was stationed without him generating the lead. For example, some leads are generated through the appliance department at Home Depot, where "associates are trained and signs are posted in the store for customers who may be interested in having their water tested * * *."

**{¶23}** Additionally, Barno would notice that when he did get paid commission on a sale, it was "short paid. * * * Typically, it was in that $25 to $50 range. It's hard to know when I get no disposition with my leads. All I get is a one line marketing bonus figure. No disposition * * * in my paperwork as to who they actually got to and did a water test and who and when and where they sold."

{¶24} Barno also testified about what he perceived as "violation[s] of acceptable moral and legal standards on the part of GLWT." According to Barno, Hlavac told him that Hlavac "has problems with communicating with anybody of the foreign tongue. He also would not want to try to sell to anyone from India because in his words our water's like gold to them * * *." Barno told Hlavac that he felt this was discriminatory, but Hlavac said "it has to go on. It's a demand" that Barno do it.

{¶25} Barno testified that more "problems became apparent when in May and June many people came in and complained that they went through the process, it was a terribly long process. It took them three hours. They never anticipated three hours and, of course, when they didn't buy they didn't receive the $20 gift card." Barno further testified that he had "ongoing" discussions with Hlavac about this issue.

{¶26} Asked why he did not "reach out" to anyone else at GLWT to discuss the issues he was having, Barno testified that Abe Bahhage ("Bahhage"), the president of GLWT, "is a very hard man to reach," and that he "was told by [Hlavac] all correspondence goes through him." According to Barno, Hlavac told him that Bahhage was "not to be bothered" with questions about his paycheck. In May, Barno left Bahhage a message regarding Hlavac's instructions about approaching "various groups," but never got a call back. According to Barno, GLWT is a small company and there is not anybody else to report to.

{¶27} Bahhage testified that GLWT employs three to four in-store marketers, and during the period Barno was employed, there was only one pay structure. Bahhage testified that they do not pay commissions to in-store marketers. "Commissions are paid to the outside sales rep who actually goes out and does the sale. The lead generators [are] paid hourly and [they get] a bonus

based on production" for every in-home water test demonstration and every sale. According to Bahhage, GLWT does not have a written employee handbook or policy manual; rather, GLWT would notify employees of the pay scale and bonus structure the day of the interview and during training the first week on the job. GLWT prepared a document for the UCRC hearing, which explained the bonus structure as follows:

```
1-9        DEMOS/week      $2.00 each
10-14  DEMOS/week$3.00 each
15-19  DEMOS/week$4.00 each
1-4        SALES/week  $5.00 each
5-9        SALES/week  $10.00 each
```

{¶28} "[E]very once in a while somebody will come in and say * * * I had * * * 14 demos. I was paid for you know 12. * * * And then we say * * * no problem * * * and this happens * * * every once in a while on payday * * * and then we look it up and we correct it. We always correct it. Twenty-eight years in business." Bahhage further stated that "[t]his has happened with [Barno] as well * * * and we fixed it."

{¶29} Bahhage testified that Hlavac

expressed some frustration * * * always trying to explain the same thing as far as the pay program over and over on the demos and the sales to Mr. Barno. * * * [I]t seemed that Mr. Barno felt that anytime he talked to somebody at the store that that should be a demo and * * *, the fact of the matter is when we call these people after the fact we end up talking to somebody's wife who says no we're not interested and those leads never see the light of day, and we explained that weekly to him every time we gave him his * * * paycheck there was a bonus and that bonus was explained this is * * * four demos and a sale or three demos and no sales or no demos but hey try again next week * * * keep the leads coming and * * * so every week we went over that program so Brian was a little frustrated that [Barno] never seemed to understand * * * the pay program.

* * *
On Tuesday we have a short meeting to go over your production last week and see if we can help you, motivate you, and so forth. We would then hand you your paycheck and on the paycheck there would be your hours as well as any bonus

you've earned. The bonus you've earned, we would then go through your appointments that you * * * generated and we would give you the dispositions, what happened with each one and what sales were there and we would actually hand you the check and that's it. If there was a mistake that was made or a discrepancy, we would correct it on the spot * * *.

{¶30} Bahhage never personally went through this with Barno, but he was "in the room when that was happening."

{¶31} According to Bahhage, GLWT was not aware of Barno's "feeling" that GLWT paid "$25 * * * per sale and a $50 per sale" until he applied for unemployment, and this "comes as a huge surprise. * * * I thought he knew that I was very approachable. I'm always in the office and * * * for the most part my door is open. * * * If you're not satisfied with anything or with your manager you come and see me. Everybody knows that." Bahhage testified that he never received any letters or voicemails from Barno.

{¶32} As to Barno's allegations of unethical practices, Bahhage testified that potential customers need to be homeowners, and they need to be available for the in-home demonstration. Furthermore, GLWT's policy toward selling their products to elderly customers is "really a gray area." Bahhage testified that "the issue with the elderly sometimes is * * *, if they're older * * *, if we end up in somebody's home * * *, the children might not be happy about that situation. I certainly wouldn't be if somebody went to visit my mother and tried to sell her something." According to Bahhage, GLWT expects "a judgment call on that." Bahhage testified that GLWT has no other customer qualifications or requirements "whatsoever."

{¶33} Hlavac testified that he is a marketing manager at GLWT and has been employed with the company since October 2012. According to Hlavac, on the day Barno quit, he attended the Tuesday meeting to pick up his paycheck. When Barno looked at his paycheck, he "said he

didn't understand the * * * bonus structure again, which I had explained to him on numerous occasions and he said that he quit." Hlavac testified that Barno was under the impression that he would get a bonus for every lead he generated, rather than for demonstrations and sales. "I believe that's where the discrepancy was and I tried to explain that" to Barno. Hlavac also denied receiving a letter in April from Barno regarding Barno's concerns about his paycheck.

**{¶34}** As to Barno's ethical concerns, Hlavac testified that GLWT had a "target demographic" regarding customers that the in-store marketers were instructed to approach at Home Depots. Hlavac does not recall Barno ever raising any concerns he had over "venturing outside this demographic."

**{¶35}** In the case at hand, the UCRC's decision was based on the following reasoning:

> [Barno] argued that he quit because he had consistently not been paid the bonuses he believed he was due and because of ethical objections with company procedures. * * * While [Barno] had been aware of these issues for several months, he did not quit until August 26, 2014. During that time * * * any concerns he mentioned were only brought to his immediate supervisor. Although [Barno] was in the main office every Tuesday, and Mr. Bahhage's office was very close to the meeting room, [Barno] admits that he never spoke with Mr. Bahhage about his concerns or the alleged failure of Mr. Hlavac to properly address those concerns. The evidence does not establish that the employer's conduct was so unreasonable or egregious as to constitute just cause for quitting. Accordingly, [Barno] quit work without just cause.

**{¶36}** In reaching this conclusion, the UCRC based its decision on 1.) The time that elapsed between Barno's "awareness" of workplace issues and Barno's quitting; 2.) Barno's failure to report workplace issues to anyone other than his "immediate supervisor"; and 3.) The "reasonableness" of GLWT's failure to address Barno's concerns in light of number one and number two.

**{¶37}** First, in *Morad v. Dir., O.D.J.F.S.*, 8th Dist. Cuyahoga No. 86296, 2006-Ohio-1350, ¶ 38, this court reversed a UCRC's decision as being "unlawful, unreasonable, and against the manifest weight of the evidence" when the hearing officer found the employee's reason for quitting was not credible "because she did not 'immediately' quit." *Morad* at ¶ 35. There is no requirement that an employee quit "immediately" after a concern arises to be eligible for unemployment compensation.

**{¶38}** Second, "Ohio courts have determined that a person who quits because of a problem with working conditions must first notify the employer of the problem and provide the employer with the opportunity to deal with the problem." *Belle Tire Distrib. Inc. v. Dir., Ohio Dept. of Jobs & Family Servs.*, 8th Dist. Cuyahoga No. 97102, 2012-Ohio-277, ¶ 16. The UCRC's finding that Barno "only" notified his immediate supervisor of the issues and "never spoke with Bahhage about his concerns" is not evidence that Barno failed to satisfy the notice requirement. We find that raising an issue with management effectively notifies the employer of the alleged problem.

**{¶39}** Third, we find that the UCRC's focus on GLWT's conduct to determine whether Barno quit his employment with just cause was improper. *See Ohio Turnpike Comm. v. Saunders,* 8th Dist. Cuyahoga No. 61059, 1992 Ohio App. LEXIS 5708 (Nov. 12, 1992) ("just cause for quitting employment * * * requires a lack of fault on the part of the employee"); *King v. State Farm Mut. Auto Ins. Co.*, 112 Ohio App.3d 664, 669, 679 N.E.2d 1158 (6th Dist.1996) ("a statutory administrative proceeding under R.C. Chapter 4141 centers on 'just cause' and the conduct of the employee").

**{¶40}** Additionally, upon review, we find that the UCRC ignored undisputed evidence in the record. *See generally Breeze, Inc. v. Testa*, Slip Opinion No. 2017-Ohio-7801, ¶ 15 ("We will reverse [administrative agency] decisions that are 'unreasonable or unlawful.' It was unreasonable for the [administrative agency] to ignore Breeze's evidence of its intent regarding its lease with Horizon and focus solely on the excess of rental income over expenses"). Although GLWT testified as to its bonus structure, the only evidence in the record as to what GLWT told Barno during his interview is Barno's testimony, the notes Barno took during his interview, and the April 28, 2014 letter Barno wrote to Hlavac, which states, in part, as follows: "Per our agreement, #1 would pay $25.00 and #2, $50.00." GLWT did not present any evidence contradicting Barno's understanding of the bonus structure, other than a document prepared after the fact and specifically for the UCRC hearing. What GLWT promised to pay Barno and what it actually paid Barno are two different things, and GLWT presented no evidence regarding what it promised to pay Barno. In reviewing the UCRC's decision, it is clear that the hearing officer failed to consider Barno's unrefuted testimony and documentary evidence. *Compare Sinclair v. ODJFS*, 8th Dist. Cuyahoga No. 101747, 2015-Ohio-1645, ¶ 25-32 (UCRC must consider evidence in the record and can "discredit" or weigh the sufficiency of certain evidence by making credibility determinations).

**{¶41}** The UCRC did not find Barno's version of events or GLWT's version of events more credible than the other; rather, it based its decision on GLWT's conduct, i.e., the failure to address Barno's concerns after Barno complained to his direct supervisor, Hlavac, but not to the owner of the company, Bahhage, as not being "so unreasonable or egregious as to constitute just cause for quitting." Furthermore, GLWT explained why it instructed Barno to avoid elderly

customers and why it required customers to be homeowners. Additionally, GLWT explained that it instructed Barno to avoid customers who do not speak English. However, GLWT did not deny that Hlavac told Barno to avoid "Russians, Orientals, or Indians," and GLWT presented no evidence at all regarding Barno's allegation that customers did not receive the promised Home Depot gift cards or that GLWT ignored customer phone calls related to canceling contracts. Again, we find that the UCRC's decision overlooks Barno's evidence.

{¶42} Upon review, applying the standard set forth in *Eastley* regarding manifest weight of the evidence in civil cases, we find that the greater amount of credible evidence in the record supports the conclusion that a reasonable person would have just cause to quit his or her job under the same conditions. The only evidence presented to the hearing officer was that Barno was not paid what GLWT promised him during his interview. This evidence is unrefuted, credible, and a significant reason for Barno leaving his job. Barno properly notified GLWT of his concerns, and the company, while neither denying nor admitting what it told Barno regarding the bonus structure, failed to satisfactorily remedy the situation. The weight of the evidence also shows that a reasonable amount of time elapsed between Barno's realization of his employment issues, his repeatedly notifying Hlavac of the problems, his realization that GLWT was not going to remedy the situation, and his quitting.

{¶43} Accordingly, the UCRC's decision that Barno quit his employment without just cause is against the manifest weight of the evidence. Barno's two assigned errors are sustained.

{¶44} The trial court's judgment is reversed, and this case is remanded for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellees costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON, JUDGE

MARY J. BOYLE, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR